UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

KEVIN HARPER,

        Plaintiff,

v.                                Case No. 18-C-753

ERIC STEFONEK, et al.,

        Defendants.

**DECISION AND ORDER GRANTING DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT**

In this *pro* se civil rights action, Plaintiff Kevin Harper alleges that several correctional officers at the Waukesha County Jail used excessive force against him when returning him to his cell, another correctional officer failed to intervene to prevent the others' use of excessive force, and correctional officers and a jail nurse failed to provide him adequate medical treatment or accommodate his needs after this incident and after a later fall in the shower. Plaintiff filed this action for damages under 42 U.S.C.§ 1983 against the correctional officers and nurse. The court has jurisdiction over this case pursuant to 28 U.S.C. § 1331. Currently before the court are the defendants' motions for summary judgment and Plaintiff's motion to recruit counsel. For the following reasons, the defendants' motions for summary judgment will be granted, Plaintiff's motion to recruit counsel will be denied, and the case dismissed.

**BACKGROUND**

On November 13, 2017, Plaintiff was booked at the Waukesha County Jail on a probation hold. At the time of the alleged events, Plaintiff was subject to Inmate Management

Protocols because of his history of disciplinary infractions. These included the following protocols:

> ****Shower Protocol****
>
> D/T failure to lock in after showering, inmate will be escorted to a secure shower handcuffed behind his back with a second officer present.
>
> ****Inhaler Issuance Protocol****
>
> Inmate will be restrained behind the back, also utilizing a tether. The tether will be held tightly and the cell door will be opened. With one officer maintaining control of the tether and at least one officer maintaining physical control of subject's arm, medical staff will maintain control of the inhaler and allow the inmate to take the required dosage puffs of the inhaler. Inmate will not dictate which staff members maintain physical control of him or which medical staff will issue the inhaler's use.

Defs.' Prop. Findings of Fact, Dkt No. 110 at 4.

**A.      March 6, 2018**

At approximately 4:10 p.m. on March 6, 2018, Lieutenant Christopher Bischoff was assigned as a Pod 2 officer and was serving dinner in the pod. Plaintiff was on a bag meal protocol, which meant that he was to step to the back of the cell and kneel facing the rear of the cell away from the door when his meal was delivered. Bischoff stood at the door to Plaintiff's cell and directed him to step to the back of his cell and kneel facing the wall. Plaintiff did not comply but instead began debating the protocol with Bischoff. Bischoff again directed Plaintiff to step back and kneel, but he again refused to comply. Under the protocol, failure to follow the directives of the protocol is considered a refusal of the meal. Bischoff proceeded to distribute meals to the other inmates in Unit A and then returned to Plaintiff's cell. When Plaintiff persisted in debating the protocol, Bischoff exited the unit.

Shortly thereafter, Plaintiff hit his intercom stating he was having an asthma attack. Medical backup was called immediately via radio. Lieutenant Erik Stefonek and Bischoff; Officers Dominic Cattani, Christopher Domurat, Greg Miller, and Troy Holzhueter; and Nurse Beal responded to the call and went to Plaintiff's cell. Holzhueter stood to the right of Plaintiff's cell, Miller stood directly in front, Bischoff stood off to the left, and Domurat stood a few feet behind Bischoff. Stefonek stood at a distance observing. As shown in a video recording of the incident (Dkt. No. 115), Plaintiff initially complied with the protocol and presented his hands behind his back so the handcuffs could be applied through his cell's tray chute with a tether attached. Once the handcuffs were applied, Plaintiff's cell door was opened with the tether held tight to keep Plaintiff's back against the door as it opened so he could be safely assessed by the nurse. During this assessment, Plaintiff would not stand up straight, claiming he was too weak because he had not been fed. Bischoff used an escort hold to support Plaintiff by the arm.

Once the nurse completed her assessment, Plaintiff was ordered to go back into his cell. Plaintiff denies that any such order was given at any point. Plaintiff resisted the defendants' attempts to get Plaintiff back into his cell and to close his door. Bischoff continued to use an escort hold on Plaintiff to assist him getting back into his cell. Holzhueter, who was holding the tether attached to Plaintiff's wrist restraints, held tension on the tether to prevent his hands from moving. Holzhueter also placed his left shoulder and foot against the door to prevent it from opening any farther.

In response to Plaintiff's continued resistance and refusal to comply with orders, Stefonek ordered that focused knee strikes be used against Plaintiff in order to gain control and

3

compliance, and to secure him back into his cell. Plaintiff denies resisting the officers' attempts to get him back into his cell but his efforts to resist are clearly visible on the video recording of the incident. Bischoff, who was directly facing Plaintiff, delivered approximately three focused knee strikes with his left leg to Plaintiff's left upper outside thigh. Domurat states that he also attempted to deliver a knee strike but hit Plaintiff's cell door. Plaintiff states that Domurat struck him and not the door. While Bischoff delivered the knee strikes, Holzhueter continued to hold the tether and apply counter weight against Plaintiff's cell door. Neither Holzhueter nor Miller delivered any knee strikes. After the knee strikes were delivered, Cattani joined the officers' attempts to close Plaintiff's cell door. Plaintiff's cell door was then pushed closed. Right before the door was closed, Bischoff's hand got trapped and was slammed in the cell door, injuring it.

After Plaintiff's cell door was closed, Holzhueter applied counter resistance to the tether to put Plaintiff's hands in a position where his wrist restraints could be removed. At some point, Miller took control of the tether, Holzhueter held Plaintiff's left hand, Cattani held Plaintiff's right hand, and his hand restraints were removed. Cattani, Holzhueter, Domurat, Stefonek, and Bischoff did not observe any injuries to Plaintiff.

Following Plaintiff's placement back in his cell, Nurse Link, accompanied by several correctional officers, assessed his injuries. Link's progress notes from her examination indicate that Plaintiff had a small laceration/abrasion on his right wrist the size of a pea that Link instructed him to wash with soap and water. Link also informed Plaintiff that if he has any other injuries that he should submit a written medical request. Plaintiff claims that when Link

4

examined him there was a lot of blood, that Link observed him limping, and that she did not tell him to submit written medical requests for any other injuries that he had.

Plaintiff submitted two written medical request forms over the course of the next two days complaining of back, leg, and arm pain stemming from the March 6 altercation. A nurse responded to the first as follows: "Your arms were assessed on the date of your alleged injury. There are no abnormalities noted. Please comply with security protocols, or you will be unable to be assessed. This is for the safety of all staff, as you have become a severe security risk." Dkt. No. 90-2 at 6. The nurse's response to his other request was "[u]nable to assess due to not cooperating with security protocol." *Id.* at 7. Link was not involved in responding to either of Plaintiff's medical requests. After an investigation was conducted by Deputy Jeremy Stilling of the events that took place on March 6, Plaintiff was charged with assault by prisoner, resisting/obstructing, and disorderly conduct.

**B.     March 10, 2018**

At around 8:30 p.m. on March 10, 2018, Plaintiff was informed that it was his turn to shower. In response to Plaintiff's statements that he required a wheelchair, corrections staff contacted the medical department, which informed them Plaintiff was not on a wheelchair protocol and did not need it or other accommodations such as a shower chair. Various officers also observed Plaintiff walking around without difficulty. Defendant Officer Richard Diaz and Buboltz secured Plaintiff in restraints and escorted him to the shower. At some point Plaintiff fell in the non-shower area of the secured shower. A medical back-up call was made, and Defendant Lieutenant Nathan Adams, Buboltz, Compton, and Link, along with several other

officers, responded to the shower area. Buboltz observed Plaintiff and did not see any specific injuries to Plaintiff that required immediate medical attention.

Adams states that he attempted to get Plaintiff to "cuff up" at the door to the secured shower but Plaintiff refused. Plaintiff states that his injuries prevented him from going to the door and that he did not refuse any commands. Because Plaintiff was not able to be placed in restraints per the protocol, Link was not permitted to go into the shower area. Link observed Plaintiff through a small window and did not notice any signs of deformities or trauma. Based on Link's statement that Plaintiff was not injured, and their own observations that did not reveal any clear signs of injury, Adams, Buboltz, Compton, Link, and other officers left the area while two officers continued to monitor Plaintiff. Plaintiff asserts that Link did not observe him and that Adams, Buboltz, Compton, and Link all ignored his complaints regarding his injuries and left him there on the floor.

A plan was formulated to enter the secure shower area and apply restraints to Plaintiff which officers then executed. Buboltz assisted other officers in transporting Plaintiff back to his cell in a wheelchair.

## LEGAL STANDARD

Summary judgment should be granted when the moving party shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In other words, the time and expense of the parties and the court should not be wasted on a trial when there are no material facts in dispute, one party is entitled to judgment on those facts, and thus there is nothing to try. In deciding a motion for summary judgment, all reasonable inferences are construed in favor of the nonmoving party. *Foley v. City*

*of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004). The party opposing the motion for summary judgment must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (quoted source and internal quotation marks omitted). "The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* "[A] 'metaphysical doubt' regarding the existence of a genuine fact issue is not enough to stave off summary judgment, and 'the nonmovant fails to demonstrate a genuine issue for trial where the record taken as a whole could not lead a rational trier of fact to find for the non moving party." *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001) (quoting *Logan v. Commercial Union Ins. Co.*, 96 F.3d 971, 978 (7th Cir. 1996)). Summary judgment is properly entered against a party "who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Parent v. Home Depot U.S.A., Inc.*, 694 F.3d 919, 922 (7th Cir. 2012) (internal quotation marks omitted) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

## ANALYSIS

In its screening order, the court allowed Plaintiff to proceed on the following claims: 1) excessive force against Bischoff, Domurat, Miller, Holzhueter, and Cattani; 2) failure to protect against Stefonek; 3) deliberate indifference against Buboltz, Compton, and Link for failure to provide medical care; and 4) deliberate indifference against Buboltz and Diaz for failure to accommodate.

A.  **Excessive Force Claims Against Bischoff, Domurat, Miller, Holzhueter, and Cattani**

At all times relevant to this lawsuit, Plaintiff was incarcerated pursuant to a probation hold and was facing a charge of violating Wis. Stat. § 961.41(1)(cm)1g and was awaiting trial. There is no indication in the record that at the time of the alleged events Plaintiff's probation had been revoked, and the defendants assert that Plaintiff was a pre-trial detainee at the time the alleged events occurred. Consequently, his claim arises under the Fourteenth Amendment. *See Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015).

"[A] pretrial detainee must show . . . that the force purposely or knowingly used against him was objectively unreasonable." *Id.* This standard is not to be applied mechanically, and "turns on the 'facts and circumstances of each particular case.'" *Id.* (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). "A court must make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Id.* "A court must also account for the 'legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained,' appropriately deferring to 'policies and practices that in th[e] judgment' of jail officials 'are needed to preserve internal order and discipline and to maintain institutional security.'" *Id.* (quoting *Bell v. Wolfish*, 441 U.S. 520, 540 (1979)). The following considerations, though not an exhaustive list, bear on the court's determination regarding the reasonableness of the force used:

> the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the

threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

*Id.*

Here, the officers' use of force against Plaintiff was not objectively unreasonable given his resistance, the need to move Plaintiff back into his cell, the minimal amount of force used against Plaintiff, and the lack of serious injuries as a result of the force used. Although Plaintiff asserts that he was not resisting and that the defendants never ordered him to get back in his cell, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purpose of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). Where a video recording exists, and "[t]here are no allegations or indications that this videotape was doctored or altered in any way, nor any contention that what it depicts differs from what actually happened," as is the case here, a court must view "the facts in the light depicted by the videotape." *Id.* at 378–81. The video evidence clearly shows Plaintiff applying dead weight tactics, planting his feet on the ground, and generally actively resisting the officers' attempts to close his cell door. In truth, it appears that even Plaintiff's claim that he was in need of medical attention was simply a hoax used to retaliate against Bischoff for refusing to deliver Plaintiff his meal when he refused to comply with the protocol. The video evidence shows clearly that the forced used by the officers in their attempts to close his prison cell door was reasonable.

Regarding the use of knee strikes by Bischoff and possibly Domurat, they were limited in number, done for a valid purpose, justified based on Plaintiff's resistance to being placed back

9

in his cell, and ceased the moment Plaintiff was secure. An officer's use of physical force against an inmate who is disobeying orders in order to maintain order is not inherently unreasonable. *See Guitron v. Paul*, 675 F.3d 1044, 1046 (7th Cir. 2012) (no excessive force where the officer "did not use any force until [the inmate] disobeyed a command that was designed to maintain order within the prison"); *Soto v. Dickey*, 744 F.2d 1260, 1267 (7th Cir. 1984) ("If it is an order that requires action by the institution, and the inmate cannot be persuaded to obey the order, some means must be used to compel compliance, such as . . . physical force." ).

Plaintiff's contention that Bischoff's escort hold on Plaintiff was excessive is also unfounded as there is no indication in the video that Bischoff did anything besides support Plaintiff against the door with the hold. Further, "'[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.'" *Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)).

Finally, as will be discussed later, Plaintiff did not suffer any serious injuries as a result of this altercation. Although Plaintiff claims otherwise, the objective medical evidence, both from March 6, 2018, and from subsequent examinations, shows no indication that Plaintiff suffered any serious injuries as a result of the officers' use of force. Consequently, the court holds that the officers' use of force to get Plaintiff back in his cell on March 6, 2018, was reasonable and did not violate Plaintiff's constitutional rights.

**B.** **Failure to Protect Claim Against Stefonek**

Plaintiff's claim against Stefonek for failure to intervene and protect him against the other officers' use of excessive force fails because the officers' use of force was not excessive. Liability under § 1983 for another officer's excessive use of force only applies when the force is excessive. *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994) ("An officer who is present and fails to intervene to prevent other law enforcement officers from infringing the constitutional rights of citizens is liable under § 1983 if that officer had reason to know: (1) *that excessive force was being used* . . . and the officer had a realistic opportunity to intervene to prevent the harm from occurring." (emphasis added)). Because the officers' use of force against Plaintiff was not excessive, Stefonek's alleged inaction is not actionable under § 1983.

**C.** **Failure to Provide Medical Care Claims Against Buboltz, Compton, and Link**

Plaintiff asserts that Link failed to provide medical care to him on March 6, 2018, after he was forcefully placed back in his cell, and on March 10, 2018, after he fell in the shower area. Plaintiff also asserts that Buboltz and Compton also failed to provide him with medical care on March 10, 2018, after his fall.

**1.** **Link**

As Plaintiff was a pre-trial detainee, his claims arise under the Fourteenth Amendment. *Miranda v. Cty. of Lake*, 900 F.3d 335, 352 (7th Cir. 2018). Until recently, it was inconsequential whether the claims arose under the Fourteenth or Eighth Amendment because courts applied "the same legal standards to deliberate indifference claims brought under either the Eighth or Fourteenth Amendment." *Phillips v. Sheriff of Cook Cty.*, 828 F.3d 541, 554 (7th Cir. 2016). After the Supreme Court's decision in *Kingsley v. Hendrickson*, 135 S. Ct. 2466

11

(2015), however, the Seventh Circuit held "that medical-care claims brought by pretrial detainees under the Fourteenth Amendment are subject only to the objective unreasonableness inquiry identified in *Kingsley*." *Miranda*, 900 F.3d at 352. Consequently, Plaintiff's claims against Link should be analyzed under the Fourteenth Amendment's objective unreasonableness standard. *See Walton v. Hendrickson*, No. 17-cv-956-bbc, 2019 WL 1929202 (W.D. Wis. Apr. 30, 2019) (applying the Fourteenth Amendment's objective unreasonableness standard to a plaintiff who was incarcerated for a probation violation).

Under the Fourteenth Amendment's objective unreasonableness standard, "the controlling inquiry for assessing a due process challenge to a pretrial detainee's medical care proceeds in two steps. The first step, which focuses on the intentionality of the individual defendant's conduct, remains unchanged and 'asks whether the medical defendants acted purposefully, knowingly, or perhaps even recklessly when they considered the consequences of their handling of [plaintiff's] case.'" *McCann v. Ogle Cty., Illinois*, 909 F.3d 881, 886 (7th Cir. 2018) (quoting *Miranda*, 900 F.3d at 353). "A showing of negligence or even gross negligence will not suffice." *Id.* At the second step, the court asks "whether the challenged conduct was objectively reasonable." *Id.* "This standard requires courts to focus on the totality of facts and circumstances faced by the individual alleged to have provided inadequate medical care and to gauge objectively—without regard to any subjective belief held by the individual—whether the response was reasonable." *Id.*

### i. March 6, 2018

Nurse Link's March 6, 2018 treatment of Plaintiff was not objectively unreasonable as the facts establish that Plaintiff was not suffering from an objectively serious medical condition

12

at that time. Under the objective reasonableness standard, a plaintiff "must still adequately allege that she was suffering from an 'objectively, sufficiently serious' medical condition." *Dodson v. Cook Cty. Jail*, No. 16 CV 0345, 2019 WL 764041, at *3 (N.D. Ill. Feb. 21, 2019) (quoting *Townsend v. Cooper*, 759 F.3d 678, 689 (7th Cir. 2014)); *see also Miranda*, 900 F.3d at 347 (noting that the defendants conceded that a pretrial detainee's condition was objectively serious). In her treatment notes for her examination of Plaintiff immediately following his altercation with the correctional officers, Nurse Link states "inmate was involved in a altercation with officers has small open area on right wrist size of a pea informed inmate to wash area with soap and water informed if any other injury to write to medical." Dkt. No. 90-2 at 4. Plaintiff's small open wound does not constitute an objectively, sufficiently serious medical condition. *Morrisette v. Boyd,* No. 16-3140, 2016 WL 4059185, at *3 (C.D. Ill. July 29, 2016) (holding that scrapes and bruises are not considered objectively serious medical conditions); *Williams v. Elyea*, 163 F. Supp. 2d 992, 998 (N.D. Ill. 2001) (holding that quarter-inch laceration in mouth was not a serious medical need).

Plaintiff's claims that he was suffering from a serious injury at the time are not supported by the record. Plaintiff's assertion that he was bleeding profusely as a result of the officers' actions is not substantiated by the objective evidence: there are no signs that he was bleeding in the recording of the incident and the only verified injury he sustained was a small pea-sized laceration to his wrist. Although Plaintiff alleges, citing the absence of any mention in her treatment notes, that Nurse Link did not assess injuries that he sustained to his knee, leg, and ankle—injuries that allegedly led to him falling in the shower on March 10—Plaintiff's treatment notes subsequent to March 6 and March 10 confirm that he did not have any

13

objectively serious injuries in those areas. A March 12 treatment note states that despite his complaints of left ankle, knee, and right wrist pain Plaintiff's range of motion for all three areas remained intact. Dkt. No. 90-2 at 14–15. An additional treatment note from March 12 stated that Plaintiff's knee had full range of motion and no swelling or deformities. *Id.* at 16. In addition, it was noted that although Plaintiff stated he was unable to walk there was no medical abnormality to either leg. *Id.* Regarding Plaintiff's wrist, an x-ray was ordered to rule out any bony deformity or fracture and both wrists had full range of motion and capillary refill time to all fingers under three seconds. *Id.* The treatment note concluded "no physical abnormalities noted, no evidence of significant injury noted to any body system. Patient is medically clear—pending results of X-ray to right wrist." *Id.* The x-ray of Plaintiff's right hand showed a grossly intact right hand and wrist with no signs of deformities or fractures observed. *Id.* at 17. Further treatment notes indicated no signs of any injuries despite Plaintiff's continued complaints. *See id.* at 18–36. Consequently, the record shows that Plaintiff was not suffering an objectively serious medical condition when Link inspected him on March 6.

### ii. March 10, 2018

Plaintiff's claim that Nurse Link's care for him on March 10 was objectively unreasonable fails for the same reason: Plaintiff did not suffer a serious injury as a result of his fall. As discussed earlier, examinations of Plaintiff after March 10 showed no signs or indications of any serious injuries as a result of this or the previous incident. Plaintiffs' March 14 progress notes state, "[Patient's] knee and back were assessed, no swelling, bruising, discoloration, or loss of sensation noted, denies loss of bowel or bladder control. Patient has full circulation to both feet and wrists, no objective abnormalities noted." *Id.* at 18. Because there is

14

no evidence that Plaintiff was suffering from objectively serious medical conditions, his claims that Link's care for him was objectively unreasonable fail, and the claims will be dismissed.

### 2. Buboltz and Compton

Plaintiff's claims against Buboltz and Compton fail for the same reason his claim against Link does: the medical evidence does not establish that Plaintiff had injuries "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Wynn v. Southward*, 251 F.3d 588, 593 (7th Cir. 2001). Neither Buboltz nor Compton observed any serious injuries, and their reliance on Link's evaluation of Plaintiff's injuries was appropriate: "'If a prisoner is under the care of medical experts . . . a non-medical prison official will generally be justified in believing that the prisoner is in capable hands.'" *Greeno v. Daley*, 414 F.3d 645, 656 (7th Cir. 2005) (quoting *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004)). Consequently, the claims will be dismissed.

### D. Failure to Accommodate Claims Against Buboltz and Diaz

Plaintiff contends that Buboltz and Diaz failed to accommodate his request for a wheelchair or shower chair, thus denying him safe access to the shower facilities. The record, however, establishes that Plaintiff did not require a wheelchair in order to safely get to/from the shower nor a shower chair to safely shower. The medical department, which was contacted after Plaintiff requested a wheelchair and shower chair, indicated that he had no injuries that required accommodation. Buboltz and Diaz's reliance on the medical department's assessment was reasonable, *id.*, and their decision not to provide him with a wheelchair or shower chair did not violate Plaintiff's constitutional rights.

### E. Plaintiff's Motion Regarding Status of Plaintiff's Motion for Summary Judgment and Motion to Recruit Counsel

After the defendants' motions for summary judgment were fully briefed, Plaintiff filed a motion inquiring whether the court struck Plaintiff's motion for summary judgment, stating he never received a copy of any such order, and requesting that counsel be recruited. On April 12, 2019, the court granted Link's motion to strike Plaintiff's motion for summary judgment pursuant to Federal Rule of Civil Procedure 16 because of Plaintiff's unjustified delay in filing his motion, Plaintiff had the opportunity to present his arguments in response to defendants' motions for summary judgment, and because Plaintiff has the "burden of proof as to his claims, the defendants' own motions for summary judgment establish that he is not entitled to such relief in any event." Dkt. No. 138 at 2. The docket entry for the court's order indicates that a copy was mailed to Plaintiff. A copy of the court's order will be included with the mailing of this order to Plaintiff.

Regarding the recruitment of counsel, the court has denied three of Plaintiff's motions to recruit counsel, concluding that the case is not sufficiently complex to warrant court-recruited counsel and, more importantly, that Plaintiff has demonstrated an ability to communicate with the court to the extent necessary to litigate his claims. Plaintiff's numerous filings with the court have been coherent and clear. Plaintiff does not assert any new basis for his request in his current motion that has not already been considered by the court. Accordingly, Plaintiff's motion to recruit counsel is denied.

**CONCLUSION**

For the aforementioned reasons the defendants' motions for summary judgment (Dkt Nos. 81, 86) are **GRANTED** and Plaintiff's Motion to Recruit Counsel (Dkt. No. 144) is **DENIED.** The case is dismissed. The Clerk is directed to enter judgment accordingly. The Clerk is also directed to include a copy of the court's order striking Plaintiff's motion for summary judgment (Dkt. no. 138) with the copy of this order mailed to Plaintiff.

**SO ORDERED** this  7th  day of June, 2019.

> s/ William C. Griesbach
> William C. Griesbach, Chief Judge
> United States District Court